**In re LYONS TRANSPORTATION LINES, INC., Debtor.**

**In re J.R.C. ACQUISITION CORPORATION, Debtor.**

**In re DAVID WEISS WHOLESALE JEWELERS, INC., et al., Debtors.**

**Bankruptcy Nos. 90–00768E, 90–00772E and 90–3546PGH.**

United States Bankruptcy Court, W.D. Pennsylvania.

Jan. 30, 1991.

David W. Lampl, Pittsburgh, Pa., for Lyons' Official Committee of unsecured creditors.

Vedder J. White, Erie, Pa., trustee for Lyons and J.R.C.

Robert G. Sable, Pittsburgh, Pa., for David Weiss Wholesale Jewelers, Inc., et al.

Douglas A. Campbell, Pittsburgh, Pa., and Scott L. Hazen, New York City, for Weiss's Official Committee of unsecured creditors.

Robert S. Bernstein, Pittsburgh, Pa., for Weiss's petitioning creditors.

Dennis J. Spyra, Pittsburgh, Pa., U.S. Trustee.

Mark Glosser, Pittsburgh, Pa., trustee for Weiss.

## OPINION

WARREN W. BENTZ, Bankruptcy Judge.

## ISSUE

The common issue in the above cases is whether they should remain in Chapter 11 or be converted to Chapter 7 where in David Weiss there was never any hope, plan, nor intent other than to liquidate the debtor's assets, and in Lyons the business had been shut down with no real hope of revival.

## DAVID WEISS

Petitioning Creditors filed an involuntary petition for relief under Chapter 11 against David Weiss Wholesale Jewelers, Inc. Et Al. ("David Weiss") on November 13, 1990. On November 15, 1990, David Weiss filed, as a separate case, a petition seeking relief under Chapter 11. We treated Weiss's Chapter 11 petition as a response consenting to the involuntary petition; we forthwith entered an order consolidating the two cases and allowing it to proceed under the original Chapter 11 case.

David Weiss was indebted to Pittsburgh National Bank and Westinghouse Credit Corporation in the approximate amount of $26 million, secured by a lien upon invento-

Leonard F. Spagnolo, Pittsburgh, Pa., for Lyons Transp. Lines, Inc. and J.R.C. Acquisition Corp.

ry. David Weiss had some 28 retail stores, warehousing facilities and general offices. Westinghouse and Pittsburgh National Bank had notified David Weiss in the spring of 1990 that it would not renew its financing at the expiration of the financing agreement in early 1991. David Weiss, in the fall of 1990, negotiated an agreement with Schottenstein Stores, Inc. ("SSI") for the sale of all inventory to SSI at a fixed price, with permission to SSI at its expense to utilize David Weiss's employees to liquidate the inventory through David Weiss's retail outlets until January 31, 1991, with David Weiss paying the rental on such retail outlets. By November 13, 1990, the agreement was substantially finalized but disenchanted creditors filed the involuntary petition on that date. An informal creditors' committee which had met with David Weiss's management prior to November 13, 1990 was replaced by an Official Committee of Unsecured Creditors appointed by the U.S. Trustee and was composed of substantially the same membership.

The David Weiss agreement with SSI was renegotiated and at a hearing held on November 20, 1990, with an increase in purchase price by SSI and a reduction in the amount claimed by the secured creditors, the Creditors' Committee consented to the agreement as being the surest and best means of liquidating the David Weiss inventory for the benefit of creditors. The redrafted agreement was approved November 29, 1990. The cash generated paid off the secured creditors and leaves a balance of some $8 million for eventual distribution to administrative expenses and hopefully, 25% for unsecured creditors after liquidation of remaining assets.

David Weiss has yet to sell a quantity of inventory which was not included in the sale to SSI, collect various funds due to David Weiss, and sell David Weiss's interests in a number of the leases which have advantageous terms for David Weiss, as tenant, and which may be assumed and assigned.

From a time prior to the filing of the case, there was never an intent to attempt to rehabilitate the Debtor or its business.

The Debtor and the Creditors' Committee seek to remain in Chapter 11, file a plan of liquidation and distribution, and wind up the case in Chapter 11.

## LYONS

Lyons Transportation Lines, Inc. ("Lyons") filed a voluntary petition under Chapter 11 on October 19, 1990 having suffered operating losses to the point where its principal lender, holding a lien upon all accounts receivable as security, declined to continue the financing. Lyons shut down and consented to motions for relief from stay filed by creditors holding liens upon a large part of the truck fleet. The Debtor, for a six day period at the end of October, attempted to regain its lost business on a much-reduced scale, but after six days, concluded that the business could not be regained and ceased all operations. Lyons owns outright substantial value in rolling stock, equipment, and real estate and its remaining skeleton crew of employees is assembling these assets at four different locations to facilitate sale. Accounts receivable of some $2.2 million are being collected, although it appears that half are over a year old. Public Utilities Commission trucking rights remain to be sold and litigation to collect freight undercharges and to recover for an alleged fraudulent conveyance is expected. There is no hope of rehabilitating the business, nor was there a reasonable prospect of rehabilitation when the petition was filed.

The Creditors' Committee and the Debtor prefer to remain in Chapter 11 asserting their right to do so, that liquidation in Chapter 11 will be more economical and speedier than in Chapter 7 and that the Debtor has a right to file a plan of "reorganization" entailing a complete liquidation and distribution according to the priorities of the Bankruptcy Code.

## J.R.C. ACQUISITION CORPORATION

J.R.C. Acquisition Corporation ("JRC") filed a Chapter 11 petition on October 19, 1990. JRC is the parent corporation of Lyons and its only function in these proceedings is as the holder of all the stock of Lyons and it is obligated for the purchase price to the prior owners.

## PROCEDURE

On December 19, 1990, the Court issued an Order for a hearing in both of the above cases to determine whether the cases should proceed under Chapter 11 or be converted to Chapter 7. On December 31, 1990, the U.S. Trustee filed motions in each case to convert to Chapter 7. Hearings were held January 3 and 15, 1991.

## DISCUSSION

The Creditors' Committee in David Weiss asserts that it represents over 20% of the unsecured debt of David Weiss and that it has the authority and the fiduciary obligation to represent all creditors even though there has been no notice to them and no meeting of creditors. It asserts that its members are knowledgeable in retail trade and the disposition of the type of assets held by David Weiss, that their expertise is needed to advise the Debtor, and that while the Committee has no confidence in the management of David Weiss, it has secured the agreement of such management to have it supervised by a "responsible officer" whose position and power would be endorsed and enforced by order of court. The Creditors' Committee in Lyons asserts also that its expertise is needed by the parties in the liquidation of the Debtor's assets and that a Chapter 7 trustee would be ineffective in conducting such liquidation and in conducting litigation to collect on certain choses in action on behalf of Debtor's estate.

The Debtors and Creditors' Committees argue that the Debtors have a right to file a "liquidating" plan during the exclusivity period under § 1121 and if no such plan is filed, the Committee then can file a "liquidating" plan, that a "liquidating" plan in the above instances will provide a higher return and more expeditious recovery to unsecured creditors than they would receive under Chapter 7. Further, pending the filing of a plan, all of the assets may be liquidated and the plan which would follow can provide for distribution on the same terms as in a Chapter 7. They also argue that there is no statutory or case law authority preventing the liquidation prior to

filing a plan and subsequently filing a "liquidation" plan. They argue that distribution will be quicker and cheaper under Chapter 11. Lyons also argues that if Lyons is converted to Chapter 7, the Public Utilities Commission may revoke certain operating rights which it has and which may be a valuable asset to the estate and that conversion to Chapter 7 would prevent Lyons from making "significant" representations and warranties with respect to the business and the operating rights in making sales thereof. Lyons also argues that significant litigation in connection with freight undercharges is highly complex and requires the expertise of parties familiar with the transportation industry and that a trustee, in having to retain experts in the field, would increase the administrative expense connected with such litigation as well as reducing the recoveries therefrom. The same argument is made relating to certain fraudulent conveyance issues which may result in litigation by the estate.

The U.S. Trustee argues that these Debtors are effecting liquidation of all of their assets even before a § 341 meeting can be convened, that only the 20 largest creditors were consulted, representing 20% of the unsecured debt, whose views may or may not coincide with the remaining bulk of the creditors, that notice is therefore insufficient, that the cases should be converted to Chapter 7 for cause in the best interests of the creditors, that the numerous professionals which the Debtors and Creditors' Committees have already sought to engage are unnecessary to the liquidation and that liquidation should be allowed only after confirmation of a plan upon which creditors have a right to vote after receiving the plan and a disclosure statement. The U.S. Trustee also questions the vigor and impartiality with which the Debtor would pursue avoidable transfers to insiders or other affiliates.

Our interpretation and application of the Bankruptcy Code must be in accord with the following expression of Congressional intent: "Chapter 11 of the Bankruptcy Code deals with the reorganization of a financially distressed business enterprise, providing for its rehabilitation by adjust-

ment of its debt obligations and equity interests." S.Rep. No. 989, 95th Cong., 2d Sess. 9, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5795. "The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders." H.R.Rep. No. 595, 95th Cong., 2d Sess. 220 *reprinted in* U.S.Code Cong. & Admin.News 5963, 6179.

■ At common law, prior to the Bankruptcy Act, a business in financial distress could resort to a common law composition in which the debtor could agree to a compromise settlement with all of its creditors and, with the benefit of such debt adjustment, stay in business. This required the consent of his creditors—not some of his creditors, but *all* of his creditors. If any creditor dissented, he had the right to bring suit for the money due and either collect in full or levy on the assets of the debtor. If a dissenting creditor got paid in full, it would likely disrupt the agreement of the other creditors to take less than 100%. Thus, the common law composition had some very serious defects. These were remedied by the Chapter XI provisions of the Bankruptcy Act, further refined and expanded by Chapter 11 of the Bankruptcy Code. These provisions allow a debtor to make a composition with the creditors under which a specific majority can bind the minority, thus rendering it impossible for one or two obstinate creditors to thwart the desire of the majority to keep the debtor in business. However, the function of the common law composition, Chapter XI and Chapter 11 as seen by the above legislative history was to provide a means of rehabilitation of the debtor's business. It was not intended as a means of liquidation. This historic background supports the clear meaning of Congressional intent expressed above.

■ The Debtors argue that the filing of a Chapter 11 case with no intent to attempt rehabilitation and with no hope of rehabilitation and solely for the purpose of liquidating assets under the control of the Debt-

or, with the advice and perhaps supervision of a committee of creditors is permissible under the Bankruptcy Code, citing § 1123 and § 363(b). Even *Collier on Bankruptcy*, 15th Edition, § 1112.03[i] infers that there is no prohibition in the present circumstances in the filing of a Chapter 11 case by a debtor for the sole purpose of liquidation. No authority is cited other than § 1123.

§ 1123 provides:

(a) Notwithstanding any otherwise applicable non-bankruptcy law, a plan shall—

.        .        .        .        .

(5) provide adequate means for the plan's implementation, such as—

.        .        .        .        .

(B) transfer of all or part of the property of the estate to one or more entities, whether organized before or after confirmation of such plan;

§ 1123(b) provides:

(b) Subject to subsection (a) of this section, a plan may—

.        .        .        .        .

(4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;

The argument is that this language, together with § 363(b), which allows the sale of property of the estate out of the ordinary course of business, authorizes a debtor to utilize Chapter 11 as a means of self-liquidation. To the contrary, we read these provisions as necessary elements in a statutory scheme which provides flexibility in financial restructuring for the rehabilitation of a debtor's business.

■ Businesses outside of bankruptcy often dispose of unneeded assets, unprofitable operations, or even whole segments or divisions of the business for the benefit of the remaining enterprise. The same factors come to bear in a reorganization wherein the business may need to divest itself of assets or elements unnecessary to the reorganized business. This is recognized in § 362(d) in that one of the neces-

sary criteria in determining whether to grant relief from automatic stay to a lien creditor is whether the collateral is necessary for a reorganization. Also, Chapter 11 reorganization plans not infrequently provide that all of the assets are transferred from a single debtor or multiple related debtors to a new corporate entity (as in the confirmed plan of *Wheeling–Pittsburgh Steel Corporation, Et Al* Bankruptcy No. 85–793, [Bankr.W.D.Pa., December 18, 1990], where substantial assets were sold off and remaining assets approximating $1 billion in value were transferred to the new operating entities). The point is that the above provisions of § 1123 must exist in the statute to accommodate such financial restructuring but are not intended as blanket authority for a distressed business to liquidate itself as a debtor-in-possession under the protective umbrella of the Bankruptcy Code and the Bankruptcy Court.

So, also, § 363 is intended to authorize the disposition of assets at any stage of the proceeding, but we believe that such disposition must be consistent with the nature of the proceeding itself. The issue is not whether the Bankruptcy Court has authority to authorize a sale of substantially all of the assets of the debtor in Chapter 11; the issue is whether the debtor may maintain itself in Chapter 11 for the purpose, from the beginning, of liquidation.

In David Weiss, this court approved a sale of substantially all of its inventory to SSI for $31 million, thus agreeing with the Creditors' Committee that the transaction would generate as much cash for that merchandise as might reasonably be expected by piecemeal liquidation and that immediate action on that proposal was necessary because of the coming Christmas season, after which that sale would not be available. But the Court's approval of the sale of inventory just before Christmas on an emergency basis, without notice to all creditors, does not necessarily lead to the conclusion that it is permissible to allow the Debtor to remain in Chapter 11 for the purpose of continuing the self-liquidation.

The U.S. Trustee argues that irrespective of the original purpose of the Chapter 11 filings, the cases should now be converted to Chapter 7 pursuant to § 1112(b), which provides:

(b) Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee, and after notice and a hearing, the court may convert a case under this chapter to a case under Chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including— (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

■ In the case at Bench, there is no likelihood of rehabilitation. The U.S. Trustee asserts that the continuing costs of administration constitute diminution of the estate, warranting conversion to Chapter 7. It might be argued that the expenses of administration must be absorbed in any liquidation and therefore payment of such expenses is not a diminution of the estate. The opposing argument is that the assets have a value as assets of the Debtor's business and if they cannot be maintained intact without accruing losses, then there is a diminution of the estate. We conclude that the estates are being diminished within the meaning of § 1112(b)(1) by the administration expenses and that such diminution will occur whether the cases are in Chapter 11 or in Chapter 7.

The Committee in David Weiss asserts that a Chapter 11 plan may be quickly proposed and quickly accepted and money will get to creditors faster than in a Chapter 7. No examples of such a quick plan proposal, confirmation and distribution were cited. The Court has not experienced any. Our impression is to the contrary. If the Chapter 11 process involving a plan, disclosure statement, hearings, voting, confirmation and distribution were faster and less expensive than the Chapter 7 procedures, Congress would doubtless have incorporated such a procedure in the Code's basic liquidation chapter, Chapter 7.

The Committee argues that the expertise of the members of the committee would be unavailable to a Chapter 7 trustee and that

such expertise would be necessary to an efficient liquidation of the assets. We know of no reason why such expertise would not be available to a Chapter 7 trustee. Members of the Committee testified as to their willingness to cooperate with a Chapter 7 trustee if one were appointed.

The Committee's argument in Lyons that PUC rights would be lost in Chapter 7 was not supported by the testimony, which indicated that such rights are not lost but may be sold in Chapter 7. The Committee's argument that Lyons could effect a better sale of assets in Chapter 11 because it could make representations and warranties to prospective buyers—is illogical because a Chapter 11 debtor in liquidation can give no better warranties than a trustee.

The Committees and the Debtors argue that a Chapter 7 trustee will be unfamiliar with the businesses of these respective Debtors and much time will be lost in bringing the trustee "up to speed." Our view is that Chapter 7 trustees are thoroughly familiar with their duties under the Bankruptcy Code and how to fulfill them. No one suggested that the attorneys for the Creditors' Committees or the Debtors were familiar with the Debtors' affairs until shortly before the filing of the Chapter 11 petitions herein.

Also, we note that in David Weiss, the Creditors' Committee is represented by a Pittsburgh law firm and a New York law firm. The Debtor is represented by a Pittsburgh law firm. The Committee filed an application for the appointment of an accounting firm to represent the Committee. The Debtor also filed an application for an accounting firm to represent the Debtor.

In Lyons, the Debtor has a Pittsburgh law firm and the Creditors' Committee has a Pittsburgh law firm and each have filed applications for appointments of separate accounting firms. It may be necessary to engage special counsel for prosecution of the anticipated lawsuits whether undertaken in Chapter 11 or Chapter 7.

In David Weiss, the Committee, not trusting the handling of the remaining activities to existing management, filed an application for the appointment of a "re-sponsible officer" to which the Debtor's officers consented. The agreement also provided that the existing corporate officers would each continue their prepetition salaries of over $400,000 per year until January 31, 1991. The prepetition officers would apparently have no duties notwithstanding their continued receipt of substantial compensation. Substantial compensation for the "responsible officer" is expected.

We see no indication that the administration expenses will be less under Chapter 11 than in Chapter 7.

While individual witnesses from the Committee stated that they preferred to stay in Chapter 11 rather than have the case converted to Chapter 7, they indicated that there had been no effort to compare the costs of Chapter 7 with the costs of Chapter 11, and had not otherwise discussed Chapter 7 as a viable alternative. The discussions were, of course, conducted under the supervision of the attorneys for the Debtor and the attorneys for the Creditors' Committee. It did not appear that the witnesses from either Committee were aware of § 702 which enables the creditors to select their own trustee, nor their right under § 705 to elect a creditors' committee to consult with the trustee, nor § 327 which allows the trustee to utilize the services of the debtor's attorney and/or attorney for creditors for special purposes, provided there is no adverse interest. Since the purpose of the testimony of Committee witnesses was to show their preference for Chapter 11 over Chapter 7, their lack of such awareness is noteworthy.

Each Committee argues that it, as the representative of all creditors, should control the proceeding. To be sure, at common law, upon agreement of 100% of the creditors, a debtor may liquidate and distribute the funds as the parties may agree. But, David Weiss is in this Court because at least three creditors dissented and filed an involuntary petition. We must presume those creditors opted for the equitable distribution concept of the Bankruptcy Code, as well as its framework of procedural impartiality. Lyons' petition was volun-

tary, but in either case, the result is the immediate erection of the protective umbrella of the Code. A debtor and his creditors may control the affairs between them, but when they must take refuge in the Bankruptcy Court from dissenting creditors, they must be bound by the procedural safeguards developed over many years in the Bankruptcy Code. §§ 702, 705 and 327 provide to creditors such control over administrative matters as Congress deems appropriate.

■ The Committees and the Debtors argue that the weight of authority permits the strategy attempted here—self-liquidation under Chapter 11 prior to the confirmation of a Chapter 11 plan of reorganization.

The Committees and the Debtors seem to argue that because bankruptcy courts have authorized sale of part or all of a debtor's assets in Chapter 11, it necessarily follows that a debtor may file a Chapter 11 petition for the purpose of liquidation. Their conclusion is in error. The issues are different. In David Weiss, we authorized the immediate sale of inventory and efforts to liquidate the remaining assets—but that was done on an emergency basis with the major parties agreeing and the evidence overwhelming that delay, even a delay long enough to give notice to all creditors, would cause substantial losses.

In *In re All America of Ashburn, Inc.*, 40 B.R. 104 (Bankr.N.D.Ga.1984), the Court refused to convert to Chapter 7 and allowed the assets to be liquidated by the Chapter 11 trustee. But there, (1) a Chapter 11 trustee had been in place, (2) the case was filed August 18, 1983 and the motion to convert was filed March 28, 1984, (3) the creditors' committee had gained much knowledge and experience in voluminous production of documents and (4) the main remaining asset in the case was a chose in action against the moving party.

The Court, in *In re Alves Photo Service, Inc.*, 6 B.R. 690 (Bankr.D.Mass.1980) refused to convert to Chapter 7 where the Chapter 11 trustee had been on board from the beginning, had liquidated substantial assets and others remained to be liquidated and potential litigation resolved, the trustee had engaged in five full days of examination plus three separate document production sessions and five more days of examination were anticipated, all of the trustee's actions were necessary, there were no allegations of cause for removal of the current trustee, and there was no continuing loss to the estate. Conversion would have meant replacing the old trustee with a new trustee. The Court reviewed the earlier authorities at page 694 and ascertained that under the Bankruptcy Act, "once a Chapter X reorganization has commenced in good faith, a later decision to liquidate by no means requires discontinuance of the petition." The Court limited its conclusion to the specific facts of the case, noting that conversion is not mandatory under § 1112(b), but that the Court is given wide discretion to make an appropriate disposition. In the cases at Bench, there is no existing trustee and no indication of special preparation other than the normal learning which any attorney must undertake at the outset of a case.

*In re WFDR, Inc.*, 10 B.R. 109 (Bankr.N.D.Ga.1981), *In re WHET, Inc.*, 12 B.R. 743 (Bankr.D.Mass.1981) and *In re Boogaart of Florida, Inc.*, 17 B.R. 480 (Bankr.S.D.Fla. 1981) involved sales of assets, but not whether the case should remain in Chapter 11.

In *In Re Liberal Market, Inc.*, 11 B.R. 742 (Bankr.S.D.Ohio W.D.1981), the Court appointed an examiner with broadened powers on a motion for appointment of an operating trustee, commenting at page 745:

When old case precedents were negated by providing for the liquidation of a business [11 U.S.C. § 1123(b)(4)], certainly such a liquidation is contemplated under Chapter 11 only in connection with a plan duly confirmed, and not as a substitute to avoid the thrust and expedition of a Chapter 7 Trustee. It is still reasonable to read the spirit of such cases as *In re Pure Penn Petroleum Co.*, 188 F.2d 851, 2d Cir. (1951), into any scheme of using a "reorganization" process as a subterfuge and overly luxurious administrative vehicle to accomplish a purpose no differ-

ent from a more expeditious Chapter 7 liquidation.

In converting the case from Chapter 11 to Chapter 7, the Court in *In re L.S. Good & Co.*, 8 B.R. 315 (Bankr.N.D.W.Va.1980), stated at page 318:

> ... liquidation is generally not the proper function of reorganization proceedings, but the function of Chapter 7 proceedings. *In re Pure Penn Petroleum Co., Inc.*, 188 F.2d 851 (2nd Cir.1951). Debtors should not continue in control of their businesses under the umbrella of the reorganization court beyond the point at which reorganization no longer remains a realistic undertaking, unless liquidation would proceed more expeditiously and less expensively under the control of the debtor. There is nothing in the record of these proceedings to suggest that the debtor-in-possession is either better able or more motivated to proceed promptly with an efficient liquidation than is an experienced fiduciary whose commitment is to the promotion of parity among interested parties rather than to self-interest. There is every reason to believe that the substantial cost savings realized by minimizing the fees and expenses of debtor's counsel and the Creditors' Committee's counsel should more than offset the fees and expenses of a trustee. *Matter of Maplewood Poultry Co.*, 2 B.R. 545 (1980) (Bkrtcy.U.S.B.C.D. Me.)

In *In re Natrl Plants and Land Management Company*, 68 B.R. 394 (Bankr.S.D.N.Y.1986), the Court did not permit the Debtor to proceed with a liquidation plan and converted the case to Chapter 7 explaining at page 396 (quoting from *Matter of W.J. Rewoldt Co.*, 22 B.R. 459 (E.D.Mich.1982)):

> Liquidation is not the proper function of reorganization proceedings, but the function of Chapter 7 proceedings.

Also of importance was the fact that major assets of the estate were claims against related entities.

The case of *In re Wright Air Lines, Inc.*, 51 B.R. 96 (Bankr.N.D.Ohio 1985) was converted to Chapter 7 upon a finding that there was no reasonable likelihood of rehabilitation.

In confirming a plan calling for three years of payments and then refinancing and then liquidation in event of default, the Court in *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr.S.C.Cal.1982) said:

> The primary purpose of the reorganization chapter of both the Act and Code has been to promote restructuring of debt and the preservation of economic units rather than a dismantling of the estate.... [T]he primary focus and effort of a Chapter 11 proceeding should be a reorganization.

We conclude that there is no authority in the Bankruptcy Code allowing a debtor to file a petition for relief under Chapter 11 for the purpose of self-liquidation.

We are further persuaded by imagining a hypothetical. Suppose for a moment that the Committees and the Debtors are correct, that the Debtors here have a right under the Bankruptcy Code to file a Chapter 11 petition for the express purpose of liquidating, or filing a "liquidation" plan. The Committee assumes that Committee support legitimizes the Debtor's liquidation. But, if the Bankruptcy Code authorizes self-liquidation under Chapter 11, then the debtor has such authority under § 1123 *with or without creditor committee support.* Thus, if such were the rule, a debtor would be empowered to file a Chapter 11 petition and self-liquidate during the exclusivity period in spite of direct opposition by creditors. If the liquidation appeared to be reasonably efficient, there would be no basis for conversion to Chapter 7. The only remedy for unhappy creditors would be a motion for the appointment of a Chapter 11 trustee under § 1104, in which proof of the necessary elements can present substantial obstacles.

Such a rule could also effect a substantial change in bankruptcy practice. Any candidate for Chapter 7, with assets, could elect self-liquidation under Chapter 11.

If such is the rule, and if self-liquidation in Chapter 11 is more efficient than liquidation in Chapter 7, then the structure of

Chapter 7 may be questioned, as may the efficacy of the office of the U.S. Trustee which supervises the Chapter 7 trustees. The record before us and the arguments do not support such conclusions.

Hence, in the long run, the better policy is the one enunciated by Congress and, as we read it, expressly stated in the Bankruptcy Code in § 1112(b)(1).

### CONCLUSION

The above cases will be converted from Chapter 11 to Chapter 7.